EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hatillo Cash & Carry e Isidro Rosa<br>    Peticionario<br><br>        v.<br><br>Administración de Reglamentos y Permisos<br>    Recurrida<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>Pueblo Internacional, LLC<br>    Peticionario<br><br>        v.<br><br>Administración de Reglamentos y Permisos<br>    Recurrida | Certiorari<br><br>2008 TSPR 97<br><br>174 DPR \_\_\_\_ |

Número del Caso: CC-2004-633
       Cons. CC-2004-637

Fecha: 27 de mayo de 2008

Tribunal de Apelaciones:

        Región Judicial de Arecibo

Panel integrado por su Presidenta, la Juez López Vilanova, los Jueces Córdova Arone y González Rivera

Abogados de la Parte Peticionaria:

        Lcdo. Ángel M. Bonnet Rosario
        Lcdo. Alberto Omar Jiménez Santiago
        Lcda. Evelyn Meléndez Figueroa

Abogados de Wal-Mart Puerto Rico, Inc.:

        Lcdo. Juan C. Salichs Pou
        Lcda. Rebeca Caquías Mejías
        Lcdo. Luis E. Migenis López
        Lcdo. Milton Meléndez Falcón

Oficina del Procurador General:

        Lcda. Mariana D. Negrón Vargas
        Subprocuradora General

        Lcdo. Javier E. Rosario Pérez
        Procurador General Auxiliar

Materia: Revisión Administrativa

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hatillo Cash & Carry e Isidro Rosa<br>          Peticionario<br><br>          v.<br><br>Administración de Reglamentos y Permisos<br>          Recurrida<br>---------------------------<br>   Pueblo Internacional, LLC<br>          Peticionario<br><br>          v.<br><br>Administración de Reglamentos y Permisos<br>          Recurrida | CC-2004-633<br><br><br>Cons.<br><br><br>CC-2004-637 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta

En San Juan, Puerto Rico, a 27 de mayo de 2008.

El caso ante la consideración de este Tribunal requiere que nos expresemos sobre la relación entre la Junta de Planificación y la Administración de Reglamentos y Permisos y las facultades que la ley guarda para ambas agencias. Además, reiteramos la importancia de ceñirse a lo aprobado en la consulta de ubicación para asegurar que los procesos administrativos de otorgamiento de permisos para un proyecto de desarrollo realmente implanten la política pública adoptada por la Junta de Planificación.

I

El 28 de mayo de 1987, la Junta de Planificación, en adelante la JP, recibió una consulta de ubicación que

proponía un proyecto comercial en el municipio de Hatillo en un distrito de zonificación R-1. Según el plano sometido a la JP, el centro comercial ocuparía un área superficial de 60,000 pies cuadrados. Dicho proyecto proponía un "área rentable" de 50,500 pies cuadrados en un edificio principal, de los cuales 20,000 pies cuadrados se reservarían para establecer un supermercado. Según el memorial explicativo, el resto de dicha área se ocuparía por los siguientes negocios: "[t]ienda de zapato, joyería, tienda de telas, tienda de ropa de hombre, [b]outique y tienda de variedades." Además, de los planos consta una estructura accesoria de 2,500 pies cuadrados para la ubicación de un banco y dos estructuras adicionales de 3,500 pies cuadrados cada una para negocios de comida ligera. El 2 de septiembre de 1987, la JP emitió una resolución permitiendo el uso de los terrenos bajo los parámetros de un distrito C-4, pero dejó en suspenso la aprobación de dicho proyecto y su consulta de ubicación hasta tanto se le presentara un informe mostrando la viabilidad del proyecto, utilizando los siguientes criterios:

1. <u>Un área de mercado más reducida</u>, debido a que el proyecto es de carácter comunal y obviamente no va a tener el nivel de captación que ellos alegan.
2. La viabilidad de los "fast foods" es necesario considerarla separadamente del análisis del centro comercial.
3. Una vez considerado lo anterior, deben incluirse las variables según se indican a continuación:
   a. Población e ingreso del área de mercado en ambos análisis.

      b. Costo por concepto de alimentos y de comidas ligeras de la clientela a servir ("fast foods" solamente).

      c. Demanda actual y potencial (hasta 1990) en ambos análisis.

      d. Oferta actual y futura de los negocios existentes y aprobados por la Junta de Planificación análogos a los incluidos en el proyecto en ambos análisis.

      e. Determinación del déficit de oferta comercial en el área de mercado en ambos análisis.

   4. En la determinación de la viabilidad económica de los "fast foods" será muy importante la consideración de la variable "flujo vehicular" para fines del análisis. (Énfasis nuestro.)

El Departamento de Comercio posteriormente sometió un informe evaluando la viabilidad del proyecto objeto de consulta. Su preocupación principal giraba en torno al área de mercadeo, ya que el proyecto era demasiado extenso, y recomendó que dicho proyecto se limitara a un total de 56,900 pies cuadrados. Según el resumen de dicho informe recogido en la Resolución de la JP del 16 de junio de 1988, el endoso del proyecto, tal como se propuso, era contingente a la denegación de la consulta de otro centro comercial de tipo regional en Hatillo, consulta número 87-05-1501-JPU, que supliría las necesidades de toda la región. Asimismo, el Departamento de Comercio recomendó que "se limite la construcción del proyecto objeto de consulta a 56,900 pies cuadrados [y que se distribuya el espacio en] facilidades comerciales vecinales…, traslado de negocios [hasta] 19,000 pies cuadrados, negocios de comidas ligeras… [y] espacio para oficinas". Además, recalcó "que los 19,000 pies cuadrados se consideraran [sic] siempre y

cuando se utilicen para traslado de negocios operando en Hatillo".

Luego de celebrar una vista pública, la JP aprobó la Consulta de Ubicación número 87-05-0898-JPU para el proyecto "La Ceiba Shopping Mall". Bajo las determinaciones de hecho de dicha resolución se describió con más detalle los tipos de negocios que ocuparían los locales del centro comercial. Particularmente se dispuso:

> Los comercios a establecerse son la relocalización del Supermercado Rosas con un área de 20,000 pies cuadrados, una tienda Pitusa de 10,000 pies cuadrados, un "laundry", joyería, revelado de fotos, tienda de ropa de hombre, tienda de ropa de mujer, tienda de telas, tienda de zapatos de hombre y mujer, la Farmacia Dortas (relocalización) y oficinas. (Énfasis nuestro.)

La aprobación de la consulta de ubicación se acordó tomando en consideración "las proyecciones poblacionales y… la disponibilidad de los terrenos apropiados para la construcción… en el área que comprende el proyecto propuesto… [y la viabilidad del] desarrollo de los terrenos anteriormente descritos para el uso propuesto." (Énfasis nuestro.) Además, dispuso que la construcción del centro de mercadeo debería estar en "real y efectiva construcción" dentro de treinta meses desde que se notificara la aprobación de la consulta. La resolución disponía que transcurrido este término sin que el proyecto estuviera en real y efectiva construcción, cualquier solicitud de prórroga se tenía que presentar ante la JP para extender la vigencia de la consulta. La solicitud debía presentarse

treinta días antes de la fecha de expiración de la última aprobación y señalar los motivos para la petición. Además, requeriría evidencia del progreso en la preparación de los documentos que se deben presentar para cumplir con la consulta aprobada.

El 25 de abril de 1989, el promovente presentó, tardíamente, un desarrollo preliminar para la consideración de la Administración de Reglamentos y Permisos, en adelante ARPE. Así, pues, el 26 de octubre de 1989, la JP emitió otra resolución reabriendo el caso y autorizando la consulta de ubicación bajo los mismos términos y condiciones, ya que la primera quedó archivada al haber transcurrido los seis meses de su vigencia sin que la parte promovente presentara el desarrollo preliminar ante ARPE.[1] En la misma resolución, la JP advirtió que "el proyecto deberá estar en <u>real y efectiva construcción antes del 8 de febrero de 1991</u>". (Énfasis nuestro.)

Así las cosas, el 18 de julio de 1991, ARPE autorizó el desarrollo preliminar del centro de comercial descrito a continuación:

> De acuerdo a la información suministrada por la parte peticionaria, se propone la construcción de… una, [sic] el edificio principal, que incluye un <u>supermercado con 30,000 pies cuadrados</u>, un área comercial para variadas oficinas y comercios de 20,000 pies cuadrados; dos, un edificio para banco

---

[1] La razón que se dio para no presentar a tiempo el desarrollo preliminar era que no se había podido firmar el préstamo de construcción por problemas con la inscripción de las fincas. La consulta mantuvo su vigencia hasta el 5 de junio de 1990, ya que se notificó el 5 de diciembre de 1989.

de 3,000 pies cuadrados; tres, un comercio "fast food" de 3,500 pies cuadrados y un cuarto edificio para "fast food" para un Burger King de 3,500 pies cuadrados; todo para un total de construcción de estructuras de 60,000 pies cuadrados. (Énfasis suplido.)

Como parte de la resolución, específicamente se dispuso que "se deberá cumplir con todo lo dispuesto por la Junta de Planificación de Puerto Rico, en su resolución de la Consulta de Ubicación número 87-05-0898-JPU". Además, para su aprobación, dispuso que "los usos a establecerse en este proyecto estarán de conformidad con las disposiciones del Reglamento de Zonificación, para un Distrito de Zonificación (C-4), según lo dispuesto en los señalamientos y recomendaciones establecidas por la Junta de Planificación de Puerto Rico *en la consulta de referencia*." (Énfasis suplido.) Dicho permiso tenía vigencia de un año durante el cual se debían certificar los planos de construcción. De no hacerse así, el caso quedaría automáticamente archivado y se entendería desistido por el promovente.

Finalmente, el 2 de marzo de 1998 el promovente presentó ante ARPE una Solicitud de Permiso de Urbanización con el propósito de obtener un permiso de movimiento de tierra para la construcción de las obras pluviales necesarias para canalizar escorrentías en un área de 60,000 pies cuadrados del centro comercial. Ésta fue aprobada el 30 de marzo de 1998.

Posteriormente, ARPE recibió una solicitud para la aprobación de un Desarrollo Preliminar Alterno, la cual

concedió el 20 de marzo de 2000, a través del Permiso Núm. 00DL8-00000-00115.  Según los planos y los datos recogidos en el Anejo I del permiso, además de la reubicación de los lotes comerciales, los cambios consistían en edificar 34,950 pies adicionales como parte del mismo proyecto. ARPE aprobó el permiso, pero dispuso en dicho anejo lo siguiente:

> Se autoriza desarrollo preliminar alterno para rearreglo [sic] de ubicación de los edificios y facilidades del "Centro Comercial La Ceiba" manteniendo la capacidad y densidad comercial según autorizado por la Junta de Planificación. (Énfasis nuestro.)

También consta en dicho anejo que "aunque en los planos se ubican edificios con cabida o área mayor a los 60,000 pies cuadrados autorizados por la Junta de Planificación, reconoce la parte promovente/proyectista que para lo adicional deberá obtener la correspondiente autorización enmendada por parte de la Junta de Planificación."

En el Permiso de Urbanización que ARPE otorgó el 30 de noviembre de 2000, se aclaró que el área de construcción de edificación autorizada es de 60,000 pies cuadrados.  Dicho permiso se enmendó el 21 de octubre de 2003 sólo para que constara que el edificio a construirse se denominaría "supermercado Amigo".  Asimismo, se reiteró que "la cabida de construcción del anteproyecto aprobado se mantiene según la aprobación original… [y que el] proyecto del Supermercado futuro… constará de 30,000 pies cuadrados de construcción."

Los peticionarios, Hatillo Cash & Carry y Pueblo International, LLC, solicitaron intervenir en los procesos administrativos. Por su parte, Walmart Puerto Rico, Inc., en adelante Walmart, también solicitó intervención. Todas las intervenciones se declararon con lugar y ARPE le notificó a los interventores copia de la enmienda expedida el 21 de octubre de 2003. Ambos peticionarios solicitaron reconsideración de dicho permiso. Particularmente, Hatillo Cash & Carry alegó, entre otras cosas, que el permiso no procedía porque excedía los parámetros autorizados por la JP y porque ARPE había actuado al margen de las disposiciones establecidas por la JP en la Consulta de Ubicación. ARPE declaró sin lugar las mociones de reconsideración el 14 de enero de 2004. Dos días después, ARPE aprobó el Permiso de Construcción para el área del supermercado.

Inconforme con las determinaciones de ARPE, Hatillo Cash & Carry y Pueblo International presentaron sendos recursos de revisión ante el Tribunal de Apelaciones. Luego de varios incidentes procesales, el foro apelativo determinó que ARPE había actuado dentro de sus facultades otorgadas por ley. Los peticionarios recurrieron oportunamente ante nosotros de sus respectivas sentencias. El 29 de octubre de 2004 expedimos y consolidamos ambos recursos de certiorari. Walmart presentó su alegato en noviembre de 2005 y ARPE compareció en cumplimiento de

orden en diciembre del mismo año.  Con el beneficio de la comparecencia de todas las partes, pasamos a resolver.

II

La Ley Orgánica de la JP establece los propósitos generales por los cuales se creó la agencia.  Ley Núm. 75 de 24 de junio de 1975, 23 L.P.R.A. sec. 62 *et seq*. Particularmente, el artículo 4 dispone que el propósito primordial de la JP es:

> … guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado, económico, el cual, de acuerdo con las actuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos hubiere de fomentar en la mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella eficiencia, economía y bienestar general social en el proceso de desarrollo en la distribución de la población, en el uso de las tierras y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente.  23 L.P.R.A. sec. 62c.[2]

Para que la JP pueda dedicar sus esfuerzos a las determinaciones de política pública y estrategias de desarrollo físico, económico y social del país, la legislatura delegó en ARPE el velar por el cumplimiento de las leyes y reglamentos y llevar a cabo los asuntos operacionales correspondientes. Asoc. Por Bienestar Vecinos Urb. Huyke v. Banco Santander, 157 D.P.R. 521, 550 (2002);

---

[2] Véase además, Asoc. de Vecinos de San Jorge v. United Medical, 150 D.P.R. 70, 79 (2000); Junta de Planificación v. J.A.C.L. 109 D.P.R. 210, 214 (1979).

The Richards Group v. Junta de Planificación 108 D.P.R. 23, 31-32 (1978).[3] Así pues, la Ley Orgánica de ARPE define las facultades y funciones de la agencia.  Ley Núm. 76 del 24 de junio de 1975, 23 L.P.R.A. sec. 71 *et seq*.  Destacamos particularmente el inciso (p) del artículo 5 que impone a ARPE el deber de:

> Aplicar y velar el cumplimiento de sus propios reglamentos, de los Reglamentos de Planificación que haya adoptado o adopte la Junta de Planificación de Puerto Rico para el desarrollo, subdivisión y uso de terrenos y para la construcción y uso de edificios, así como el cumplimiento de toda ley estatal, ordenanza, o reglamentación de cualquier organismo guberna-mental.  23 L.P.R.A. sec. 71d.

Asimismo, la Ley Orgánica de la JP permite delegar ciertos asuntos a ARPE, limitado exclusivamente a aquello

---

[3] La Exposición de Motivos de la Ley Orgánica de ARPE reconoce el cúmulo de funciones operacionales que recaen sobre la JP que impide que dicha agencia pueda desempeñar su función primaria de orientar y coordinar el desarrollo integral de Puerto Rico.  Así dispone:

> A tenor con lo anterior y para fortalecer el proceso de planificación integral, haciendo a su vez más eficiente su instrumentación, se crea una Administración de Reglamentos y Permisos cuya función básica será ejecutar las funciones operacionales que al presente desempeña la Junta y aplicar y velar por el cumplimiento de las leyes y reglamentos de planificación, permitiendo a la Junta de Planificación que dedique todos sus esfuerzos y recursos a su función esencial de integrar y coordinar la formulación e implementación de las políticas y estrategias del desarrollo físico, económico y social de Puerto Rico.  Ley Núm. 76 de 24 de junio de 1975, Leyes de Puerto Rico, pág. 234.

que la misma ley contempla.[4]  El artículo 11, en su inciso

19, permite:

> Delegar en la Administración de Reglamentos y Permisos deberes y responsabilidades que, en ley o de acuerdo a los Reglamentos de Planificación, se reservaron a la Junta en los siguientes casos… o determinaciones en los que medien cualesquiera de las siguientes condiciones:
> (i)  …
> (ii) Que la estructuración o decisión a adoptarse <u>no requiera implantar una política pública</u>, por haber sido éstas ya establecidas o adoptadas por la Junta;
> (iii)   Que la Junta determine, a la luz de la función de dicha Administración, que pueden resolverse los casos o adoptarse las determinaciones con más celeridad o eficiencia por la Administración...   (Énfasis nuestro.) 23 L.P.R.A. sec. 62j.

Cada paso para lograr la aprobación de un proyecto de

desarrollo ante estas agencias tiene su propósito

particular. Es mediante estos procesos de planificación que

la JP establece la política pública encomendada en su ley

orgánica y ejerce sus facultades reglamentarias de

zonificación y planificación de usos de terrenos.  <u>ARPE v.

Rivera</u>, 159 D.P.R. 429, 438 (2003); <u>López v. Antonio Roig

Sucrs., Inc.,</u>  157 D.P.R. 187 (2002); <u>T-JAC, Inc. v. Caguas

Centrum Limited</u>, 148 D.P.R. 70 (1999).  Según el Reglamento

para  Procedimientos  Adjudicativos  de  la  Junta  de

---

[4] Además, el artículo 16 de la Ley Orgánica de ARPE establece que "[no] se expedirá ningún permiso de construcción, o de uso, para ningún edificio o estructura… que esté en conflicto con las recomendaciones de la Junta de Planificación de Puerto Rico pertinentes al plan de Desarrollo Integral de Puerto Rico, el Programa de Inversiones de Cuatro Años y los Planes de Uso de Terrenos."  23 L.P.R.A. sec. 71(o).

Planificación, una consulta de ubicación es el procedimiento ante dicha agencia

> …para que evalúe, pase juicio y tome la determinación que estime pertinente, sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas pero que las disposiciones reglamentarias proveen para que se consideren [o] [e]n áreas no zonificadas. Sección 2.00 (7) del Reglamento Adjudicativo de la JP, *supra*.

Con este mecanismo, la JP hace determinaciones de política pública mediante los procesos de adjudicación.[5] En general, esta práctica administrativa la hemos reconocido desde Ruiz Hernández v. Mahiques, 120 D.P.R. 80, 85-86 (1987). En otras ocasiones hemos resuelto que para reglamentar a

---

[5] En Puerto Rico, hemos reconocido expresamente la naturaleza cuasi-judicial de los procesos de aprobación de las variaciones en uso y las consultas de ubicación. López Salas v. JP, 80 D.P.R. 646 (1958). La Ley de Procedimiento Administrativo Uniforme define el término reglamento como "cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley…" Sec. 1.3 de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2102(*l*). Así, en Luan Investment Corp. v. Román establecimos que el proceso de planificar y zonificar es un proceso cuasi-legislativo y reglamentario. 125 D.P.R. 533, 545-546 (1990). Adjudicación, por otro lado, se define como "el pronunciamiento mediante el cual la agencia determina derechos, obligaciones o privilegios que correspondan a una parte". 3 L.P.R.A. sec. 2102(b). Cuando la JP determina aprobar una consulta de ubicación o una variación en uso, dicha agencia está ejerciendo sus facultades para determinar la política pública y guiar el desarrollo ordenado del país, pero además está adjudicando los derechos de las partes. Por eso, la agencia, al aprobar una consulta de ubicación o una variación en uso, está reglamentando a través de un proceso cuasi-judicial y adjudicativo. La mayoría de las jurisdicciones en los Estados Unidos reconocen la naturaleza cuasi-judicial de este tipo de determinación de las agencias de planificación. E.C. Yorkley, Zoning Law and Practice, 4th ed., revisiones por Douglas Scott MacGregor, §20-16, pág. 20-69 y §21-1, pág. 21-7.

través de un proceso adjudicativo, la agencia debe emitir decisiones detalladas, razonadas y fundamentadas disponibles al público para que sirvan de guía y puedan ser revisadas por un tribunal para limitar la discreción de la agencia. Asoc. de Farmacias v. Depto. de Salud, 156 D.P.R. 105, 138 (2002).

La evaluación de una consulta de ubicación es un proceso que debe integrar todos los elementos de planificación, incluyendo la viabilidad del proyecto propuesto, según se describe en la consulta de ubicación. El Reglamento 2433, aprobado como extensión enmendada a la Resolución JP-191 del 20 de mayo de 1986 para interpretar y enmendar ciertas disposiciones del Reglamento Núm. 4 de Zonificación, establece la necesidad de evaluar y estudiar los siguientes factores al considerar una consulta de ubicación:

> las condiciones geográficas, las necesidades comerciales del área, la mejor utilización de los terrenos, las implicaciones del proyecto en los sistemas de transportación, los efectos sobre el crecimiento urbano, la conservación de los terrenos agrícolas, suministro de agua y energía eléctrica, facilidades portuarias, descarga de efluentes e impacto en el ambiente.

La consulta de ubicación, una vez aprobada por la JP, también es un elemento esencial en la toma de decisiones de otras agencias. A esos efectos, la consulta es la descripción de un proyecto de desarrollo particular propuesto para un área específica que provee el marco de referencia dentro del cual las demás agencias deben medir

la viabilidad del proyecto para la aprobación de sus respectivos permisos. T-JAC v. Caguas Centrum, supra, pág. 85.[6] Por esto es importante que los permisos posteriores se mantengan dentro del marco de lo aprobado por la JP en función de sus facultades de guiar la política pública en el ordenamiento territorial.

El Reglamento de Zonificación de Puerto Rico o Reglamento de Planificación Núm. 4 autoriza los cambios en los mapas de zonificación a través de una consulta de ubicación. En particular dispone que "la parte interesada podrá iniciar el procedimiento de cambio en el mapa de zonificación sometiendo una copia del permiso de uso certificado y autorizado por la Administración de Reglamentos y Permisos como evidencia de que el mismo se construyó y se autorizó conforme a las disposiciones de la consulta. Sección 4.10 del Reglamento 6211 de 5 de noviembre de 2000. Así, una vez finalizado el proceso de otorgamiento de permisos y construido el proyecto, la aprobación de la consulta conlleva cambios en los mapas de zonificación. Por eso, todos los elementos del proyecto propuesto, y su relación entre sí y su contorno, son

---

[6] En ARPE, por ejemplo, la consulta de ubicación es indispensable para que dicha agencia pueda autorizar la construcción del proyecto y abundar sobre los pormenores del desarrollo propuesto, a base de las facultades encomendadas por ley en su pericia. Por eso, las disposiciones de la Consulta de Ubicación que aprueba la JP establecen los parámetros que ARPE debe seguir al considerar los permisos siguientes. En este caso, la resolución de la JP en 1988 dispuso: "Se utilizarán los parámetros de diseños conforme a un Distrito de Zonificación C-4".

considerados y ponderados por la JP antes de emitir su aprobación. De esta forma, los cambios significativos al proyecto durante la etapa de solicitud de permisos ante ARPE pueden alterar la integridad de la planificación que se procura a través del mecanismo de la consulta de ubicación. Por consiguiente, son cambios significativos aquéllos que hubieran afectado la decisión original de la agencia, entre éstos, cambios en la extensión del proyecto propuesto o de la parcela en la que se propone ubicarlo. Éstos son factores importantes que la JP toma en cuenta al momento de evaluar toda consulta de ubicación. No hay duda, pues, que cuando se manifiesten cambios significativos en el proyecto propuesto tales como la extensión del proyecto o su localización, hay que someterlo a una nueva evaluación. Yorkley, *op. cit.*, §20-3, pág. 20-14; véase también, T-JAC v. Caguas Centrum, supra.[7]

En Puerto Rico, le corresponde a la JP llevar a cabo dicha evaluación y determinar si lo que procede es una enmienda a la consulta original o la presentación de una

---

[7] Yorkley esboza este criterio al referirse a las variaciones en la ordenación territorial. Sin embargo, es igualmente aplicable a la consulta de ubicación. La consulta de ubicación se diferencia de una variación en uso porque el mismo reglamento de planificación hace una determinación previa sobre las situaciones en que se podrá dispensar de aplicar la zonificación para aplicar otra en particular. La variación se prevé como un mecanismo para salvaguardar la constitucionalidad de los reglamentos de planificación y zonificación, creando una forma de exceptuar la aplicación del reglamento, adjudicándolo caso a caso cuando se justifique. *Véase,* T-JAC v. Caguas Centrum, supra, pág. 82; Misión Ind. P.R. v. JP, 146 D.P.R. 64, 117 (1998).

nueva consulta.  A esos fines, el Reglamento Adjudicativo de la JP, *supra*, dispone:

> De surgir la necesidad de hacer cambios a un proyecto que alteren la consulta aprobada, se deberá someter una solicitud de enmienda a la Junta explicando en detalle la naturaleza de la enmienda y la razón para la misma, así como toda documentación (planos, estudios, etc.) pertinente y necesaria para que la Junta pueda tomar la determinación correspondiente… Como resultado de la evaluación de los cambios propuestos y dependiendo de la naturaleza y magnitud de los mismos con relación a la consulta original, la Junta podrá requerir la radicación de una nueva consulta y el cobro correspondiente. Sección 7.02 del Reglamento Adjudicativo, *supra*.

El desarrollo preliminar es un trámite que se da ante ARPE después de aprobada la consulta de ubicación por la JP, mediante el cual "se obtiene la aprobación de <u>la representación gráfica</u>… de la forma en que quedarán urbanizados los terrenos." Diccionario Técnico de los Reglamentos de la JP, pág. D-3. (Énfasis suplido.) Según la naturaleza del proyecto, dicha representación debe mostrar la ubicación y organización del desarrollo, incluyendo todo uso propuesto. *Íd.*  Asimismo, el término "uso" se define como "el propósito para el cual la estructura o edificio fue diseñado, es usado o se pretende usar". Diccionario, *supra*, pág. U-1.

Los permisos que otorga ARPE, tales como el de desarrollo preliminar y el permiso de urbanización, son fases en un proceso posterior a la probación de la consulta de ubicación que permite a dicha agencia concretar los detalles del desarrollo, supervisar la utilización de ciertos materiales, y autorizar el movimiento de terreno,

entre otros asuntos.[8]  Precisamente, esta es la etapa que tanto la JP como ARPE definen como la "fase operacional".[9]

La importancia social de la ordenación territorial se reconoció en los Estados Unidos a principios del siglo XX, como medio para controlar el desparrame urbano y las condiciones insalubres de las comunidades en las áreas urbanas densamente pobladas.  Así, la zonificación sirvió de herramienta para limitar el uso de la tierra con el objetivo de lograr un uso más eficiente y también para implementar una planificación sistemática e integrada que asegure la seguridad, salubridad, el desarrollo y bienestar general del país y de la comunidad.  Anderson's American Law of Zoning, 4th ed., revisiones de Kenneth H. Young, §1.14, pág. 21 (1996).  La forma en que se logra una planificación que asegure estos valores para la sociedad es mediante el estudio de varios factores poblacionales, como son las necesidades actuales y futuras de la comunidad y del país, el crecimiento poblacional proyectado, índices económicos, la existencia y el estado de los sistemas de sanidad y transportación y de facilidades recreativas, el

---

[8]  *Véase*, Reglamento para la Certificación de Proyectos de Construcción, Reglamento 12 de Planificación de ARPE, según enmendado el 8 de mayo de 1984, aplicable al caso de autos. El primer Reglamento Adjudicativo de la JP se aprobó en 1989, y por lo tanto, no aplicaba en este caso.

[9] *Fase Operacional*—Aquella parte de la función de revisión de proyectos que comprende, entre otros, el aplicar y velar por el cumplimiento de las leyes y reglamentos promulgados para el uso, desarrollo y subdivisión de terrenos, así como para la construcción de edificios y estructuras.  Art. 3 de la Ley orgánica de la JP, 23 L.P.R.A. sec. 62b(f) y Art. 3 de la Ley Orgánica de ARPE, 23 L.P.R.A. sec. 71b(*l*).

uso actual del suelo, entre otros. Anderson's American Law of Zoning, supra, §1.03, pág. 7. El poder de zonificar complementa el poder de planificar, ya que a través de la zonificación, el estado regula el uso de la propiedad y pone en práctica la política pública y los principios de la planificación que guiarán del desarrollo armonioso del país.

En fin, la planificación es un ejercicio integrador que busca salvaguardar el bienestar social y económico del país. Así se plasma en las leyes habilitadoras de la JP y ARPE. Es por eso que hemos resuelto que una declaración de impacto ambiental, como instrumento de planificación, tiene que integrar todas las etapas o fases de desarrollo de un proyecto. Colón Cortés v. Pesquera 150 D.P.R. 724, 779-780 (2000). Este enfoque responde a que una agencia no podrá tomar las decisiones que le incumben, ejercer sus facultades y aplicar su pericia eficientemente sino se le presenta el proyecto en su totalidad y de forma integrada. Por eso, aunque la consideración de un proyecto por las agencias de planificación se den en distintas etapas y cada una de ellas resulte en la expedición de determinado permiso hasta obtener, finalmente, la autorización para un uso particular, no se trata de procesos separados y distintos, sino que son partes integrales de la autorización de un mismo proyecto. La misión y deber ministerial de la agencia a la que se le haya encomendado alguna o algunas etapas en la consideración de un proyecto

siempre es evaluar la viabilidad del desarrollo particular en su totalidad. Por tal razón, ni el promovente ni la agencia podrá fraccionar un proyecto presentado a ésta para su consideración.

Antes de examinar en detalle la controversia que nos ocupa, debemos recordar que las decisiones de las agencias administrativas merecen la deferencia de los tribunales. Rebollo v. Yiyi Motors, 161 D.P.R. 69, 77 (2004); PRTC v. J. Regl. Tel. de P.R., 151 D.P.R. 269 (2000). Sin embargo, los tribunales pueden revocar la determinación de una agencia y sustituir su criterio si dicha agencia ha actuado de forma ilegal, arbitraria o caprichosa de manera que su decisión constituya un abuso de discreción. Torres Acosta v. Junta Examinadora de Ingenieros, 161 D.P.R. 696, 707 (2004); Rebollo v. Yiyi Motors, supra. Por otro lado, la sección 4.5 de la Ley de Procedimiento Administrativo Uniforme claramente dispone que las conclusiones de derecho de una agencia son revisables en su totalidad. Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2175.

III

El Tribunal de Apelaciones determinó que ARPE no se extralimitó de sus facultades cuando aprobó el desarrollo alterno del proyecto porque no otorgó el permiso para aquella parte del proyecto que excedía los 60,000 pies cuadrados autorizados por la JP en la consulta de ubicación. Concluimos que erró el foro apelativo pues con

su actuación ARPE, en realidad, evaluó y tomó decisiones sobre la construcción de un proyecto distinto al que fue aprobado por la JP, actuación que pretendió subsanar aludiendo a un proceso de "enmienda de autorización" por la JP que era improcedente.

El proyecto original, sometido ante la JP en 1987, vislumbraba un centro comercial de 60,000 pies cuadrados con unos lotes reservados para ciertos tipos de tiendas, el cual la JP aprobó considerando la realidad socio-económica del área en que se ubicaría. Dicho proyecto proponía la relocalización de un supermercado existente (Rosas) en un espacio de 20,000 pies cuadrados. Cuando se presentó el proyecto ante la consideración de ARPE, el promovente ya había alterado la configuración del proyecto en el desarrollo preliminar al abandonar la relocalización del supermercado existente para proponer la ubicación de un supermercado nuevo (Amigo). Con el Desarrollo Preliminar Alterno, otra vez se pretendió modificar el proyecto para reubicar los espacios comerciales y reconceptualizarlo como parte de un centro comercial mucho más extenso, añadiéndose unos 34,950 pies cuadrados al área total a desarrollar. Evidentemente, ya para el 2000 los planos presentados ante ARPE en la solicitud del Desarrollo Preliminar Alterno se referían a un proyecto completamente distinto al que fue considerado y aprobado por la JP. Estos cambios al proyecto original no solamente alteraron la naturaleza del proyecto final, sino que además, pueden haber alterado las

consideraciones de viabilidad en que se fundó la determinación de la JP al aprobarlo.

El que ARPE haya aprobado solamente la fracción del proyecto que cumplía con los límites aprobados en la consulta de ubicación no subsana su actuación *ultra vires*. La realidad es que la JP nunca estudió el proyecto sometido a ARPE. Por eso no tuvo la oportunidad de evaluar su viabilidad e impacto. Recordemos que cuando la JP aprobó la consulta de ubicación tomó en cuenta información sobre un proyecto comercial específico, motivado por unos factores socio-económicos determinados y las necesidades particulares de la población que hacían viable el desarrollo para el lugar en que se ubicaría. Asimismo consideró los comentarios y endosos de agencias y entidades, como el Departamento de Comercio, que se basaban en un análisis del proyecto según presentado originalmente. Al aprobar una fracción de otro proyecto como si se tratara del que fue originalmente adoptado por la JP y continuar emitiendo sobre la marcha permisos para un proyecto a todas luces distinto, ARPE actuó en contra de la razón de ser de su creación y de los poderes que le fueron delegados en la restructuración de la JP en 1975.

La JP es el organismo director del desarrollo ordenado de nuestro país y solamente a éste le incumben las determinaciones de política pública, de tal modo que no son delegables. ARPE no puede arrogarse estas funciones aunque entienda que su intervención acelera los procesos de

aprobación de permisos, considerando que ARPE se creó para que la JP pueda dedicar sus esfuerzos a las determinaciones de política pública y estrategias de desarrollo físico, económico y social del país. En fin, a ARPE solamente le incumben los asuntos operacionales, con el propósito directivo de velar por el cumplimiento de las leyes y los reglamentos aprobados por la JP. Asoc. Por Bienestar Vecinos Urb. Huyke v. Banco Santander, supra; The Richards Group v. Junta de Planificación, supra.

Reiteramos la norma de Colón Cortés v. Pesquera, supra, según la cual los proyectos no pueden fraccionarse para lograr la aprobación de permisos porque esta actuación priva a las agencias concernidas de evaluar correctamente los factores necesarios y las consecuencias de los proyectos ante su consideración. En este caso, la aprobación parcial por ARPE del proyecto mediante el Desarrollo Preliminar Alterno tuvo el efecto de fraccionar el proyecto ante su consideración en detrimento de la facultad de la JP de ordenar integradamente la planificación de este país. Además, las alteraciones al proyecto presentadas ante ARPE resultaron en cambios significativos que podrían haber variado la determinación original de la JP de aprobar la consulta de ubicación. Por eso, la JP debe evaluar el proyecto para determinar la procedencia de una nueva consulta de ubicación o una enmienda a la original, según su deber de ordenar la planificación integrada tomando en cuenta la totalidad de

proyecto propuesto. Por último, el cumplimiento de los acuerdos que recoge la JP en la consulta de ubicación es un requisito para la validez de los permisos posteriores. De suma importancia son también las condiciones establecidas en la consulta.

Por todo lo antes dicho, procede revocar la sentencia del Tribunal de Apelaciones y devolver el caso a la JP para que evalúe el proyecto conforme a las normas aplicables. Atendidas las circunstancias particulares de este caso, mantenemos la vigencia de los permisos otorgados por ARPE hasta tanto la JP evalúe el proyecto.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hatillo Cash & Carry e Isidro Rosa<br>　　　　Peticionario<br><br>　　　　　　v.<br><br>Administración de Reglamentos y Permisos<br>　　　　Recurrida<br>------------------------<br>　Pueblo Internacional, LLC<br>　　　Peticionario<br><br>　　　　　　v.<br><br>Administración de Reglamentos y Permisos<br>　　　　Recurrida | CC-2004-633<br><br><br>Cons.<br><br><br>CC-2004-637 | *Certiorari* |

*SENTENCIA*

En San Juan, Puerto Rico, a 27 de mayo de 2008.

Por los fundamentos expuestos en la Opinión del Tribunal que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones y se devuelve el caso a la Junta de Planificación de Puerto Rico para que evalúe el proyecto conforme a las normas aplicables. Atendidas las circunstancias particulares de este caso, se mantienen vigentes los permisos otorgados por la Administración de Reglamentos y Permisos hasta tanto la Junta de Planificación evalúe el proyecto.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Presidente señor Hernández Denton emitió opinión disidente y concurrente. El Juez Asociado señor Rivera Pérez concurre sin opinión escrita.

　　　　　　　　　　　Dimarie Alicea Lozada
　　　　　　　Secretaria Interina del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hatillo Cash & Carry e Isidro Rosa | * * * | |
| Peticionarios | * * | |
| v. | * * | CC-2004-633 |
| Administración de Reglamentos Y Permisos | * * * | |
| Recurrida | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Pueblo International, LLC | * * | |
| Peticionario | * * | |
| v. | * * | CC-2004-637 |
| Administración de Reglamentos y Permisos | * * * | |
| Recurrida | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Opinión Disidente y Concurrente emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 27 de mayo de 2008.

Aunque coincidimos con la determinación tomada por este Tribunal respecto a devolver el caso a la Junta de Planificación para que la agencia evalúe el proyecto en controversia y determine si procede una enmienda a la consulta de ubicación o la presentación de una nueva consulta, disentimos de la parte III de la Opinión, por entender que la norma allí establecida limita indebidamente la facultad de la Administración de Reglamentos y Permisos (ARPE) para evaluar y conceder aquellos permisos que se ajusten a lo aprobado previamente por la Junta de Planificación.

## I

De entrada, diferimos de la Opinión del Tribunal en tanto concluye que con sus actuaciones ARPE intervino con un asunto que no es de su incumbencia; a saber, la toma de decisiones que involucran la implantación de política pública sobre planificación, cosa que le atañe a la Junta de Planificación. En primer lugar, es preciso subrayar que –según surge de la propia Opinión del Tribunal– durante la concesión de los mencionados permisos por parte de ARPE, dicha agencia reiteró que sus autorizaciones estaban supeditadas a lo aprobado por la Junta de Planificación. Tanto en la aprobación del desarrollo preliminar como en la aprobación del permiso de urbanización, ARPE hizo constar que el desarrollador debía cumplir con lo establecido en la consulta de ubicación autorizada por la Junta de Planificación.

Igual determinación tomó ARPE respecto a la solicitud para la aprobación del desarrollo preliminar alterno presentada por el desarrollador, la cual contemplaba, entre otras cosas, un aumento de 34,950 pies cuadrados en el área superficial del proyecto. A pesar de dicha solicitud, la aprobación de ARPE no incluyó el mencionado exceso de cabida. Por el contrario, una vez más, ARPE expresó que la aprobación de la solicitud estaba sujeta a lo autorizado por la Junta de Planificación e, incluso, le advirtió al desarrollador que para obtener la aprobación del área adicional debía acudir a la Junta de Planificación. De este

modo, contrario a lo que concluye la Opinión del Tribunal, ARPE no se arrogó facultades que le competen a la Junta de Planificación, pues reconoció que era esta última quien debía evaluar el excedente de cabida en controversia, y se ciñó en su aprobación a lo que la referida agencia autorizó mediante la consulta de ubicación. Por otro lado, no vemos cómo la actuación de ARPE redundó en un fraccionamiento, pues, a fin de cuentas, del expediente ante nuestra consideración surge un dato importante que la mayoría omite: que el Supermercado Amigo **fue construido y se encuentra operando desde el año 2004** y que, después de todo, el desarrollador construyó dentro de la cabida aprobada por la Junta de Planificación.

En segundo lugar, entendemos que la mayoría omite hacer una distinción fundamental al determinar que ARPE se extralimitó al evaluar y tomar decisiones sobre el proyecto, "actuación improcedente que pretendió subsanar aludiendo a un proceso de 'enmienda de autorización' por la JP". Estamos contestes con la Opinión del Tribunal respecto al hecho de que ARPE no podía **aprobar** los 34,950 pies cuadrados adicionales propuestos por el desarrollador, pues ello hubiese sido contrario a los parámetros adoptados por la Junta de Planificación al autorizar la consulta de ubicación. No obstante, el hecho de que el desarrollador haya presentado su solicitud con un exceso de cabida no implica que ARPE estuviese impedida de **evaluarla.** Precisamente, por éste incluir un área superficial adicional

a la originalmente contemplada, dicha agencia se limitó en su aprobación a los parámetros establecidos por la Junta de Planificación. Ello, a nuestro juicio, no atenta contra nuestro ordenamiento jurídico ni representa una actuación *ultra vires* de parte de la agencia.

Más bien, la determinación a la cual hoy llega la Opinión del Tribunal a los efectos de catalogar la actuación de ARPE como una *ultra vires* porque evaluó el proyecto en controversia, atenta contra la economía procesal y es contraria al deber de dicha agencia de trabajar integradamente como el brazo operacional de la Junta de Planificación. No podemos perder de vista que la propia Ley Orgánica de ARPE, Ley Núm. 76 de 24 de junio de 1975, dispone que dicha agencia deberá "[e]stablecer [un] estrecho enlace y coordinación con la Junta de Planificación [...] para lograr que la política pública ambiental, y asimismo la política pública sobre el desarrollo económico, social y físico de Puerto Rico [...] se estructuren mediante el esfuerzo integral de todos los organismos gubernamentales, para proveer el máximo beneficio a la comunidad puertorriqueña". 23 L.P.R.A. sec. 71d, inciso (r). Lamentablemente, la visión que hoy adopta la Opinión del Tribunal sobre la relación entre las dos agencias es contraria al citado mandato estatutario y limita indebidamente las facultades de ARPE.

La determinación del Tribunal tampoco le hace justicia al conocido principio de que las agencias administrativas

son quienes poseen la pericia o el *expertise* para evaluar los asuntos que les han sido encomendados. Por ello, en reiteradas ocasiones hemos reafirmado que, a la luz de dicha pericia y experiencia, las decisiones de las agencias administrativas gozan de una presunción de corrección y merecen amplia deferencia. Véanse Pacheco v. Estancias, 160 D.P.R. 409, 431 (2003); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 130 (1998). No obstante, la Opinión del Tribunal deja a un lado ese reconocido axioma de derecho administrativo y, en su lugar, le resta herramientas a la agencia para atender los asuntos ante su consideración en el mejor ejercicio de su discreción.

Por otro lado, tampoco podemos avalar la conclusión de que la sustitución de la relocalización de un supermercado existente por el Supermercado Amigo abone al alegado hecho de que el proyecto que tuvo ARPE ante sí era totalmente distinto al que evaluó la Junta de Planificación. Si bien es cierto que el proyecto originalmente propuesto contemplaba la relocalización de un supermercado existente y que al ser presentado ante ARPE -por razones que no se desprenden del expediente- se alteró la propuesta original para ubicar el Supermercado Amigo, somos de la opinión que este asunto puede ser atendido por la Junta de Planificación mediante una enmienda a la consulta de ubicación. A nuestro juicio, en casos como el de autos lo procedente es que el desarrollador presente un nuevo estudio de mercado o cualquier otro documento mediante el cual, conforme a la

Sección 4.02 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 de 12 de noviembre de 1999, la Junta de Planificación pueda cerciorarse del carácter viable de la ubicación de dicho negocio en la zona concernida. De esa forma, la agencia podría estar en posición de reevaluar el asunto y resolver lo que en derecho proceda.

En fin, somos del criterio que resulta innecesario limitar, como lo hace la mayoría de este Tribunal en el día de hoy, la facultad de ARPE para aprobar permisos de construcción que se ajustan a lo autorizado por la Junta de Planificación. Nótese que, a fin de cuentas, la Opinión del Tribunal **llega a la misma conclusión a la que llegó ARPE:** que el asunto debe dilucidarse ante la Junta de Planificación. Según indicamos, ARPE dispuso que para el pietaje en exceso propuesto por el desarrollador, éste debía obtener la autorización de la Junta de Planificación. Es decir, ARPE nunca aprobó dicha autorización, sino que refirió el asunto a la agencia correspondiente –**igual que lo hace la Opinión del Tribunal en el día de hoy.**

No obstante lo anterior, el Tribunal –contradictoriamente– rechaza la actuación de ARPE y la describe como "improcedente". A nuestro juicio, lo que es verdaderamente improcedente es la decisión que hoy adopta este Tribunal respecto a la determinación de ARPE. No entendemos cómo este Foro –después de haberle dedicado varios años a la consideración de los recursos en

controversia- pretende poner punto final al asunto mediante un curso de acción que nada abona a lo que ya decidió ARPE. Por ello, entendemos que el proceder del Tribunal, después de todo, no es sino un acto de futilidad.

## II

Por todo lo anterior, concurrimos con la determinación del Tribunal de devolver el asunto a la Junta de Planificación para que dicha agencia evalúe el proyecto en cuestión, pero disentimos de la norma hoy establecida por este Tribunal, por entender que la misma limita indebidamente las facultades de ARPE.


Federico Hernández Denton
Juez Presidente